# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

August 5, 2021

Lyle W. Cayce
Clerk

No. 19-30979

George Hughes,

*Petitioner—Appellee*,

*versus*

Darrel Vannoy, Warden, Louisiana State Penitentiary,

*Respondent—Appellant*.

Appeal from the United States District Court
for the Middle District of Louisiana
USDC No. 3:16-CV-770

Before Higginbotham, Stewart, and Wilson, *Circuit Judges*.
Patrick E. Higginbotham, *Circuit Judge*:

George Hughes and Drew Hawkins fought, Hughes's gun fired, and Hawkins died. On trial for second degree murder, Hughes testified that the gun fired accidentally when Hawkins pulled on the gun and the two men collided. His testimony was contradicted by an eyewitness supposedly watching the fight from outside her apartment across the street who said she saw Hawkins backing away from Hughes with his hands raised at the moment the gun fired. Hughes's trial counsel never attempted to interview the eyewitness or her roommate, who would have testified that the eyewitness was actually inside their apartment at the time of the shooting.

No. 19-30979

Hughes applied for state postconviction relief for counsel's ineffectiveness in failing to interview the eyewitness. Though a state court commissioner recommended relief after holding two evidentiary hearings, the Louisiana courts disagreed. Hughes then sought federal habeas relief, which the district court granted, finding the state court's application of clearly established law unreasonable. The State now appeals. We affirm.

# I

## A

On November 19, 2004, Hughes's adopted daughter, Amy, and Hawkins, her boyfriend, got into an argument, during which Hawkins physically attacked Amy and locked her out of the apartment they shared. Amy called Hughes from her neighbor's phone to tell him about the fight. Hughes told her to call the police and said he would come to her apartment. Amy refused to call the police but told Hughes she would call back to let him know if things were okay. Sometime after this call, Hawkins let Amy back inside, and they continued to argue. Hughes later called the apartment, and the phone was answered. According to Hughes, he heard sounds of a struggle and heard Amy say that Hawkins was killing her. Hughes called the apartment again, and Hawkins answered. The two had a heated exchange, and Hughes told Hawkins that he was going over there and was "going to kick [Hawkins's] ass."

Hughes took a .22 caliber handgun when he left for Amy's apartment. He testified that he took the gun because Hawkins ran with a rough crowd, and Hughes was unsure who would be present at Hawkins and Amy's apartment. Upon arriving at the apartment complex, Hughes saw Hawkins and Amy outside by Hawkins's car. Hughes testified that he heard Amy scream at Hawkins to let go of their infant child and saw Hawkins yank the child away from Amy. Hughes then exited his vehicle and approached

Hawkins. During this time, the gun was in Hughes's back pocket. As he approached, Hughes saw Hawkins throw the child into the back seat of his car. The two men exchanged more words, and both threatened to hit the other. Then Hughes "flew" at Hawkins, and they began to fight. During the fight, Hughes's gun fired, and Hawkins was shot and killed.

Hughes was arrested and charged with second degree murder. He was represented at trial by public defender Scott Collier. At trial, the central issue was whether Hughes intended to shoot Hawkins or if the gun accidentally fired during the struggle.

Hughes testified that after some initial fighting, Hawkins staggered backwards, put his hands up, and said, "no more, no more." Hughes then turned to talk to Amy, at which point Hawkins saw the gun in Hughes's back pocket. Hawkins yelled for help and moved towards Hughes. Hughes testified that it seemed like Hawkins was on drugs.[1] As Hawkins advanced, Hughes calmly removed the gun from his back pocket, told Hawkins that he didn't need a gun to beat Hawkins up, and said he would place the gun on his truck. As he turned to do so, Hawkins grabbed the barrel of the gun and tried to get the gun away from Hughes. Hughes testified that Hawkins said "[g]o ahead and shoot me" and yanked on the barrel of the gun. Hawkins's hand slipped off the gun. The two men fell forward towards each other, and the gun hit Hawkins's chest and discharged. Forensic evidence supported Hughes's version of events. Dr. Gilbert Corrigan testified that Hawkins died

---

[1] A toxicology report confirmed that Hawkins was under the influence of oxycodone and diazepam. *State v. Hughes*, No. 2006 KA 2422, 2007 WL 1765559, at *4 (La. Ct. App. June 20, 2007) (unpublished).

of a "contact wound," and "the trajectory of the bullet was consistent with either a struggle or with the victim being bent over."[2]

Two eyewitnesses testified at trial contradicting Hughes's version of events, but both gave conflicting statements as to whether they witnessed the actual shooting. Amy testified at trial that she saw Hughes shoot Hawkins when Hawkins was backing up, had his hands raised, and was about one or two feet away from Hughes. She testified that, as far she could remember, she did not turn her back on the two men when they were fighting. Amy's trial testimony contradicted her initial statement to police in which she said that her back was turned at the moment the gun fired. Amy's sister also testified at trial that Amy told her she did not witness the shooting because her back was turned while tending to her child.

The other, and only disinterested, eyewitness was Sandra Allen, who testified at trial that she witnessed the altercation from outside her apartment across the street. Allen stated that she heard arguing and then went outside, where she saw two men fighting. According to Allen, one man backed away from the other with his hands raised and then she heard the gunshot and saw the man with raised hands fall to the ground. Allen's trial testimony was somewhat contradicted by her initial written statement to the police. In it, Allen said she was inside her apartment when she heard someone calling for help and a gunshot, which is what prompted her to go outside where she saw two men arguing.[3] When asked at trial why her testimony contradicted the earlier statement, Allen said she incorrectly "transposed" the events in her

---

[2] *Hughes*, 2007 WL 1765559, at *4.

[3] There is an obvious logical flaw in Allen's written statement because she could not have seen Hughes and Hawkins arguing after the gun was fired.

No. 19-30979

statement due to nerves. On cross examination, one of Hughes's attorneys[4] pressed Allen on the inconsistency, and Allen continued to insist that she witnessed the shooting.

**B**

Hughes was found guilty by a nonunanimous jury.[5] After the verdict, Collier became aware of a television interview Allen gave the night of the shooting, which Collier believed indicated that Allen was inside at the time of the gunshot. He moved for a new trial based on Allen's interview and some additional newly discovered evidence. The trial court judge denied the motion, noting that she "c[ould] not imagine" how Allen, a witness who was subpoenaed for trial, could be considered newly discovered evidence. Hughes was sentenced to life in prison without the benefit of parole, probation, or suspension of sentence.

On direct appeal, Hughes argued that the trial court erroneously denied his motion for a new trial. The Louisiana First Circuit Court of Appeal affirmed the denial because "the exercise of reasonable diligence . . . would have led to the discovery of the 'new' evidence alleged by" Collier. The Louisiana Supreme Court denied Hughes's application for certiorari.

In 2009, Hughes's new counsel filed a state postconviction application, alleging ineffective assistance of trial counsel because Collier never interviewed Allen, a key eyewitness. A state trial court commissioner held two evidentiary hearings. In them, Allen's roommate, Lee,[6] testified that Allen was watching television when both heard the gunshot. Lee said she

---

[4] Allen was cross-examined by Collier's co-counsel.

[5] The vote was 11-1.

[6] Lee's last name is also Allen. To avoid confusion, the opinion refers to Lee only by her first name and Sandra Allen by her last.

saw Allen go outside only after hearing the gunshot. Allen testified and reiterated her trial testimony that she went outside when she heard arguing and so was outside when the gun fired.

Collier testified at the evidentiary hearings as well. He said he was unaware Allen was going to testify that she had seen the shooting until the week before trial when the prosecution informed him of the content of Allen's testimony. Prior to that, he knew Allen had been subpoenaed but thought she was just going to testify to coming outside after the shooting as this was Collier's understanding of Allen's written statement to the police. Collier did not attempt to interview Allen either before or after he became aware of her supposedly changing testimony. When asked whether it was a strategic decision not to interview Allen, Collier said it was a strategic decision not to ask for a continuance when he discovered the change in testimony because it contradicted Allen's earlier written statement. He said there was no strategy behind his decision not to try to interview Allen at any time, even prior to learning of her changed testimony. Collier acknowledged that if he had interviewed Allen, he would have discovered her roommate, who would have contradicted Allen's trial testimony.

The commissioner issued a 22-page recommendation to grant relief for counsel's ineffective assistance in failing to interview Allen. However, the state trial court dismissed Hughes's application without any explanation or hearing on the matter. The state appellate court denied Hughes's request for supervisory writs without elaboration. Finally, the Louisiana Supreme Court denied Hughes relief in a single-page order, concluding he "fail[ed] to show he received ineffective assistance of counsel under the standard of *Strickland v. Washington*."

Hughes then filed the instant 28 U.S.C. § 2254 petition in federal court.[7] He asserted three grounds for relief, including one based on ineffectiveness of counsel for failing to investigate Allen's statements. The district court referred the petition to a magistrate judge. The magistrate judge concluded that counsel's decision to forgo investigating and interviewing Allen was not reasonable and that this deficient performance prejudiced Hughes at trial.[8]

The State objected to the report. The district court conducted a de novo review and agreed with the magistrate judge that the state "court's ultimate legal conclusion was objectively unreasonable." The district court adopted the magistrate judge's recommendation and ordered a new trial.

The State now appeals. The sole issue on appeal is whether the district court correctly determined that no deference was due to the Louisiana Supreme Court's denial of relief regarding counsel's failure to investigate Allen's statement.

## II

In an appeal from a district court's grant of habeas relief, this Court reviews issues of law de novo and findings of fact for clear error.[9]

---

[7] Hughes filed an earlier pro se § 2254 petition when his writ application before the Louisiana Supreme Court was still pending. The district court dismissed the petition for failure to exhaust state court remedies but gave Hughes 30 days from the receipt of the Louisiana Supreme Court decision to file another § 2254 petition. The instant petition was filed within 30 days of the Louisiana Supreme Court's denial of Hughes's writ application.

[8] The magistrate judge recommended denying relief on the other two grounds Hughes raised, a recommendation the district court also adopted. The parties additionally disputed the timeliness of Hughes's petition. The magistrate judge recommended finding that the petition was timely because equitable tolling was warranted, and the district court agreed. The State does not challenge the district court's timeliness finding on appeal.

[9] *Fratta v. Quarterman*, 536 F.3d 485, 499 (5th Cir. 2008).

No. 19-30979

### III

The Antiterrorism and Effective Death Penalty Act ("AEDPA") requires a district court to defer to a state habeas court's determination of the merits of a prisoner's claims unless the state decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[10] Where, as here, a state court correctly identifies the governing clearly established law, a state court decision may nevertheless be "an unreasonable application" of that law if it "applies [the law] unreasonably to the facts of a particular prisoner's case."[11] "A merely incorrect state court decision is not sufficient to constitute an unreasonable application of federal law . . . ."[12] Instead, the state court decision must be "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."[13]

We must "carefully consider all the reasons and evidence supporting the state court's decision."[14] That the Louisiana Supreme Court decision does not explain its reasoning does not affect our review. We are required to "determine what arguments or theories could have supported the state

---

[10] 28 U.S.C. § 2254(d)(1), (2).

[11] *Williams v. Taylor*, 529 U.S. 362, 407–08 (2000).

[12] *Virgil v. Dretke*, 446 F.3d 598, 604 (5th Cir. 2006).

[13] *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

[14] *Mays v. Hines*, 141 S. Ct. 1145, 1149 (2021) (per curiam).

court's determination"[15] and examine "*each* ground supporting the state court decision."[16]

Hughes's ineffective-assistance-of-counsel claim is governed by *Strickland v. Washington*'s two-part inquiry. He "must show: (1) 'that counsel's representation fell below an objective standard of reasonableness,' and (2) that the deficiency was 'prejudicial to the defense.'"[17] Because the *Strickland* "inquiry is highly deferential to counsel" and AEDPA defers to the state court, our review is "doubly deferential."[18]

## A

To demonstrate deficient performance, Hughes "must show that [counsel] made errors so serious that counsel was not functioning as the counsel guaranteed by the Sixth Amendment."[19] We "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."[20] Under AEDPA's standard, we must defer to the state court unless no fairminded jurist could conclude Hughes's trial counsel was reasonably competent.

---

[15] *Shinn v. Kayer*, 141 S. Ct. 517, 524 (2020) (per curiam) (internal quotation marks and citation omitted).

[16] *Wetzel v. Lambert*, 565 U.S. 520, 525 (2012) (per curiam).

[17] *Anaya v. Lumpkin*, 976 F.3d 545, 550–51 (5th Cir. 2020) (quoting *Strickland v. Washington*, 466 U.S. 668, 692 (1984)).

[18] *Id.*; *see also Knowles v. Mizrayance*, 556 U.S. 111, 123 (2009) ("[B]ecause the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard.").

[19] *Anaya*, 976 F.3d at 551 (internal quotation marks and citation omitted).

[20] *Id.* (internal quotation marks and citation omitted).

"[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."[21] Counsel's "decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."[22] The American Bar Association standards, which the Supreme Court uses as a guide for determining what is reasonable,[23] provide that "[i]t is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case."[24] Of course, "the duty to investigate does not force defense lawyers to scour the globe on the off chance something will turn up," but it does require counsel to "have good reason to think further investigation would be a waste."[25] Accordingly, "trial counsel must not ignore 'pertinent avenues of investigation,' or even a single, particularly promising investigation lead."[26]

In *Bryant v. Scott*, we found deficient performance where counsel failed to interview two eyewitnesses who could identify Bryant as the bank robber.[27] We explained that "eyewitness identification of Bryant at the crime scene was the cornerstone of the state's case in chief. Consequently, information relevant to Bryant's defense might have been obtained through

---

[21] *Strickland*, 466 U.S. at 691.

[22] *Id.*

[23] *Wiggins v. Smith*, 539 U.S. 510, 524 (2003).

[24] *Rompilla v. Beard*, 545 U.S. 374, 387 (2005) (quoting 1 ABA Standards for Criminal Justice 4-4.1 (2d ed. 1982 Supp.)).

[25] *Id.* at 383.

[26] *Charles v. Stephens*, 736 F.3d 380, 390 (5th Cir. 2013) (quoting *Porter v. McCollum*, 558 U.S. 30, 40 (2009); citing *Rompilla*, 545 U.S. at 383–84).

[27] 28 F.3d 1411, 1418 (5th Cir. 1994).

better pretrial investigation of the eyewitnesses, and a reasonable lawyer would have made some effort to investigate the eyewitnesses' testimony."[28] Likewise, here, Allen's testimony as the only disinterested eyewitness claiming to see Hughes shoot Hawkins while Hawkins was backing away with his hands raised was the cornerstone of the State's case that Hughes shot Hawkins intentionally.

It is possible that the state court found no deficient performance because, as the State argues, Collier's failure to interview Allen was a strategic decision. To be sure, "conscious and informed decision[s] on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel."[29] But Collier admitted that there was no strategy behind his decision not to even attempt to interview Allen personally or send an investigator to do so upon finding out that Allen would testify to seeing the shooting.

Another explanation for the state court's decision could be that Collier's failure to interview Allen wasn't deficient because he only found out about the supposed change in her testimony a few days before trial. However, Collier knew prior to the week before trial that the district attorney had subpoenaed Allen. And Collier had read Allen's written statement in which she claimed to have seen part of the altercation. So Collier knew that

---

[28] *Id.*; *see also Anderson v. Johnson*, 338 F.3d 382, 392 (5th Cir. 2003) (finding deficient performance and an unreasonable application of clearly established law by state court where counsel relied on the investigative work of the state and did not make any effort to interview either of the two eyewitnesses to the crime).

[29] *Ward v. Dretke*, 420 F.3d 479, 491 (5th Cir. 2005) (internal quotation marks and citation omitted).

Allen was an eyewitness to Hughes and Hawkins's fight and likely a "particularly promising investigation lead."[30]

Collier's interpretation of Allen's written statement is also unconvincing. In her statement, Allen wrote "I was sitting in . . . my front room, and heard someone calling for help. Then I heard a gunshot go off. I came out of the house and hear – and seen two people arguing."[31] Collier thought this statement "clear[ly]" said that Allen was inside at the time of the shooting. Allen's statement is far from clear. Since Hawkins collapsed after the shooting, she could not have seen the two men fighting after the shot. Thus, the written statement must be somehow incorrect. Collier's failure to do any sort of investigating work to clarify Allen's statement given the importance of her testimony belies reasonable competence.

Even if Collier lacked prior notice that Allen was a promising lead, a reasonable attorney learning of new and potentially damning testimony on the eve of trial would have moved for a continuance or at least attempted to try to investigate the new testimony in whatever limited time was available. At the state evidentiary hearing, Collier said he decided against requesting a continuance because Allen's testimony could be impeached on cross examination with her previous written statement.[32] Even accepting that the

---

[30] *Charles*, 736 F.3d at 390.

[31] Allen clarified that the two people she referred to were two men, who could only be Hughes and Hawkins.

[32] The State claims that Collier didn't move for a continuance "because they had taken a prior continuance just a few months before the June of 2006 trial setting, and their chances of getting a second continuance were not good, [so] they felt that going to trial with an inconsistent star state witness—one who could be easily impeached with her prior statements—would be in petitioner's best interest." This explanation is not found in Collier's testimony. He does note that he moved for a continuance in early 2006, but his reason for not requesting a second continuance upon learning of Allen's changed testimony was just that he did not think Allen could deviate from her written statement and that he

written statement was strong impeachment evidence, a fairminded jurist could not find that Collier's performance was rendered competent by vigorous cross examination. We rejected a similar argument in *Bryant*, explaining that "[t]he fact that [counsel]'s cross examination was effective does not necessarily indicate that a reasonable lawyer, viewing the trial *ex ante*, would have regarded an interview of the eyewitnesses as unnecessary. . . . Moreover, assuming that [counsel]'s cross examination was effective, that is not to say it could not have been improved by prior investigation."[33] And Collier had no explanation or strategic thinking behind his decision not to attempt to interview Allen himself or send an investigator to do so. We thus cannot say that a fairminded jurist would find Collier's strategic decision not to request a continuance or to even try to interview Allen to be a "conscious and informed decision."[34]

Because there is no "reasonable argument that [Collier] satisfied *Strickland*'s deferential standard" of adequate performance, we agree with the district court's conclusion that Collier's performance was deficient and the state court's determination to the contrary was an unreasonable application of *Strickland*.[35]

---

could impeach her if she did. Nowhere does he claim that deciding not to request a second continuance was a strategic decision based on the likelihood of the judge granting the motion.

[33] *Bryant*, 28 F.3d at 1418 (citing *Strickland*, 466 U.S. at 689).

[34] *Ward*, 420 F.3d at 491; *see Strickland*, 466 U.S. at 690–91 ("[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."); *see also Koon v. Cain*, 277 F. App'x 381, 389 (5th Cir. 2008) (unpublished) (per curiam) (finding deficient performance, and an objectively unreasonable state court ruling to the contrary, where counsel failed "even to attempt to interview the lone eyewitness to a crime, whose testimony [was] critical to the defensive theory presented").

[35] *Richter*, 562 U.S. at 105.

No. 19-30979

**B**

Hughes must also establish prejudice by showing "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[36] A reasonable probability "requires a substantial, not just conceivable, likelihood of a different result."[37] The jury's lack of unanimity in convicting Hughes indicates that the verdict was "only weakly supported by the record."[38] Such a verdict "is more likely to have been affected by errors than one with overwhelming record support."[39] Here, too, we must defer to the state court unless no fairminded jurist could agree with its finding of no prejudice.

"A defendant who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial."[40] Hughes argues that two pieces of evidence impeaching Allen's trial testimony would have been uncovered through competent investigation: (1) her television interview on the night of the shooting and (2) the testimony of Allen's roommate, Lee.

As a threshold matter, the State attempts to downplay the importance of Allen's testimony altogether, arguing that her testimony was not

---

[36] *Strickland*, 466 U.S. at 694.

[37] *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011) (internal quotation marks and citation omitted).

[38] *Strickland*, 466 U.S. at 696. Indeed, the only evidence indicating the gun was fired intentionally was the inconsistent testimony from Amy and Allen. On the other hand, Hughes's testimony was supported by forensic evidence indicating the gunshot was a contact wound.

[39] *Id.*

[40] *United States v. Green*, 882 F.2d 999, 1003 (5th Cir. 1989) (citations omitted).

inconsistent with Hughes's and so it could not have been a significant factor in leading the jury to convict. If so, this could explain the state court's finding of no prejudice. But Allen's and Hughes's testimonies were irreconcilable on critical facts related to the intentionality of the shooting. Allen testified that when she heard the gun fire, she saw one man backing away from the other with his hands raised.[41] That is incompatible with Hughes's testimony that Hawkins did not have his hands raised when he was shot and that the gun accidentally fired when the two men fell forward towards each other.

To be sure, there is evidence indicating that Hughes intended to harm Hawkins when he drove over to the apartment complex with a gun, namely Hughes's own statements at trial that he drove over to "kick [Hawkins's] ass." The relevant evidence of whether the shooting was accidental, though, concerns the moment of the shooting. The only evidence indicating that Hughes intended to shoot Hawkins when the gun fired was Amy's and Allen's testimony that Hawkins had his hands raised as he was backing away from Hughes at that moment. And Amy's testimony was effectively impeached by her earlier contradictory statements to police and her sister.[42] Allen's testimony was the lynchpin for the State's case.

We turn now to the specific evidence Hughes claims counsel should have discovered. First, Hughes points to a television interview Allen gave the night of the shooting. He urges that this interview has strong impeachment

---

[41] At the evidentiary hearing, Allen claimed that she did not testify that the shooting occurred when one man had his hands raised. But at trial she repeatedly said that one man "had his hands up trying to back away from the gentleman that was coming at him" when she heard the shot.

[42] There were other inconsistencies in Amy's testimony undermining her credibility. For example, she insisted that her fight with Hawkins was only verbal. But later, she admitted that Hawkins threw her up against a wall by her neck. There was also testimony that Amy feared retaliation from Hawkins's family.

value because Allen said she was inside when she heard the gun fire. A fairminded jurist could easily disagree. In the interview, Allen said "I was sitting in the house watching TV and all of a sudden I heard someone holler for help, then I heard some gun shots go off." The statement does not indicate whether or not Allen went outside during that sequence of events. At best it is only weak impeachment evidence, unable to meet the high bar for prejudice under our deferential review.

Hughes next contends that Lee's testimony would have significantly undermined Allen's testimony. Lee testified at the state evidentiary hearing that Allen was watching television on the night of the shooting and specifically stated that Allen was "sitting in the chair" inside the apartment when both of them heard the shot. Lee repeatedly testified that Allen only went outside after hearing the shot: "We heard the shot, and [Allen] jumped up and grabbed the phone. She heard somebody yell 'help,' and she went out the door."

The State attempts to minimize the impeachment value of Lee's testimony, but it mischaracterizes it in doing so. According to the State, Lee testified that "she thought that [Allen] was inside of the apartment, with the exterior door wide open, when the fatal shot was fired." Thus, the State argues that Lee did "not have personal knowledge of what [Allen] saw" through the open front door. Lee's testimony doesn't indicate whether their apartment door was open or closed on the night of the shooting, nor did Allen's trial testimony. Even if the front door was open, Allen insisted at trial that she was on the sidewalk outside her apartment when the gun fired, not that she was watching the incident through her open front door from inside her apartment. So Lee's testimony would still have cast doubt on Allen's credibility.

Alternatively, the State argues that Collier would not have discovered Lee even if he had interviewed Allen. It is difficult to see how a fairminded jurist could conclude that a reasonably competent attorney would not have learned of Allen's roommate upon interviewing Allen. Indeed, quickly into his cross examination of Allen, Collier's co-counsel asked Allen whether anyone was with her the night of the shooting, to which she answered yes. When asked during the evidentiary hearing, Collier himself admitted that he likely would have found out that Allen had a roommate if he had gone to interview her. We thus cannot say that a fairminded jurist would find discovering Lee to be beyond the scope of a reasonably competent interview of Allen.

Another explanation for the state court's conclusion could be that Collier and his co-counsel already tried to impeach Allen using her written statement, and so additional impeachment evidence would not have created the requisite probability of a different outcome. This rationale would be convincing if the written statement had impeachment value. But as we have explained, Allen's written statement suffered from an obvious logical flaw: It did not specify a reasonable course of events and therefore was easily explained at trial by Allen's assertion that she simply "transposed" the series of events. Lee's detailed and consistent testimony suffers from no such defect. Accordingly, her testimony would have been a "powerful rebuttal" to Allen's.[43]

Given the importance of Allen's testimony to the State's case and the value of Lee's impeachment testimony, we find that no fairminded jurist

---

[43] *Anderson*, 338 F.3d at 394 (finding prejudice and an objectively unreasonable state court decision where counsel failed to call a crucial eyewitness to testify because "his testimony would have been a powerful rebuttal to that of the victim and her minor daughter").

could conclude that the failure to introduce Lee's testimony would not have "undermine[d] confidence in the outcome."[44]

## IV

AEDPA sets a high bar but not an insurmountable one. The Louisiana courts' denial of relief to Hughes is one of the rare "extreme malfunctions in the state criminal justice system" that we are obliged to correct.[45] We affirm.

---

[44] *Strickland*, 466 U.S. at 694.

[45] *Dunn v. Reeves*, 141 S. Ct. 2405, 2411 (2021) (per curiam) (quoting *Richter*, 562 U.S. at 102).