# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

July 21, 2022

Lyle W. Cayce
Clerk

No. 21-40130

Douglas Tyrone Armstrong,

*Petitioner—Appellant*,

*versus*

Bobby Lumpkin, *Director*, Texas Department of Criminal Justice, Correctional Institutions Division,

*Respondent—Appellee*.

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 7:18-CV-356

Before Higginbotham, Dennis, and Graves, *Circuit Judges*.

James E. Graves, Jr., *Circuit Judge*:*

Douglas Armstrong was convicted of capital murder for the death of Rafael Castelan. The conviction was largely based on two eyewitnesses who testified that they saw Armstrong attacking Castelan. Armstrong admits to being the person the eyewitnesses saw with Castelan, but he contends he

---

* Pursuant to 5th Circuit Rule 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Circuit Rule 47.5.4.

No. 21-40130

found Castelan after the attack and was helping Castelan when the eyewitnesses arrived at the scene.

In this habeas petition, Armstrong claims his trial attorneys failed to conduct an adequate pretrial investigation. He presents evidence that he contends his trial attorneys should have uncovered and which corroborates his contention that he was only helping Castelan when the eyewitnesses arrived.

After reviewing the state court record, we conclude Armstrong's trial attorneys were not deficient in their pretrial investigation, and if they were, Armstrong has not established that he was prejudiced by the deficient pretrial investigation. The state court's decision denying Armstrong's ineffective assistance of counsel claim was therefore reasonable. We accordingly AFFIRM the district court and DENY Armstrong's petition for writ of habeas corpus.

## BACKGROUND

On April 21, 2006, at around 9:30 p.m., Rafael Castelan was murdered near his apartment at the corner of 7th Street and Silver Avenue in Donna, Texas. He was stabbed multiple times and robbed. As he was being attacked, a van approached and the two passengers, Laura Patricia Corona and Pilar Reyes, attempted to scare off the attacker. The attacker continued to fight, stab, and "jump" Castelan. Castelan attempted to run away towards the van and even touched the back door of the van. The attacker grabbed Castelan and threw him down on the ground. Corona testified that the attacker bent over twice to cut or slash Castelan and rifled through Castelan's pockets. The attacker then ran northbound down the alley. Castelan died from resulting blood loss.

When police arrived on scene, Corona and Reyes provided a description of the attacker. Police then found three potential suspects located

No. 21-40130

at the Sunshine Bar three blocks north of the scene of the murder. Corona and Reyes identified Petitioner Douglas Armstrong as the attacker.

Armstrong was arrested and interviewed by police. In his post-arrest statement, he admitted he was at the crime scene and ran away when the van approached. He, however, maintained that he found an already-injured Castelan lying on the sidewalk and tried to help Castelan by walking him to the nearby police station.

According to Armstrong, he spent the afternoon at the Sunshine Bar and left sometime between 8:30 and 9:00 p.m. He headed south on 8th Street and then west on Silver Avenue before coming upon Castelan laying on the ground and bleeding. He propped Castelan up on his shoulder and started walking. Then he saw the van drive up and thought "they got a car, they will probably call to get somebody." He admitted he dropped Castelan and ran back to the Sunshine Bar.

The State of Texas charged Armstrong with capital murder. At trial, the State relied heavily on Corona's and Reyes's testimony. The State presented other circumstantial evidence. It presented $41 in cash and Castelan's Medicaid card which were found on Armstrong when he was arrested, both with traces of Castelan's blood. The State presented the alleged murder weapon, a blue box-cutter knife, which was found in the alley behind the Sunshine Bar and had Castelan's blood on it. A grey t-shirt with Armstrong's DNA and Castelan's blood was also found in the alley. Witnesses from the Sunshine Bar testified that Armstrong left because he was out of cash and when he returned, he counted money under the bar. They also testified that Armstrong changed his shirt in the bathroom and washed blood off his fingers with beer.

Armstrong's trial attorneys attempted to discredit the eyewitness accounts and emphasized the fact that Armstrong's DNA was not found on

the Medicaid card or knife. They also focused on the State's inability to prove the $41 belonged to and was stolen from Castelan.

The jury found Armstrong guilty of capital murder. Armstrong was sentenced to death.

After an unsuccessful direct appeal, Armstrong filed an application for writ of habeas corpus in Texas state court. He raised numerous claims but focused on his ineffective assistance of counsel claims based on his trial attorneys' failure to conduct an adequate pretrial investigation and failure to investigate mitigation evidence for the penalty phase of trial. The Texas Court of Criminal Appeals agreed that Armstrong's trial attorneys failed to conduct an adequate investigation into the mitigation evidence of the punishment phase and that he was prejudiced by that inadequate investigation. It vacated Armstrong's death sentence and remanded for a new punishment proceeding. The Court denied all other claims without explanation. The State did not seek the death penalty on remand, and on March 19, 2018, Armstrong was sentenced to life imprisonment without the possibility of parole.

Armstrong filed this federal petition for writ of habeas corpus on November 14, 2018. He raises an ineffective assistance of counsel claim for his trial attorneys' failure to conduct an adequate pretrial investigation. Armstrong points to three categories of evidence that his trial attorneys failed to investigate or obtain. First, he presents evidence of two witnesses whose statements suggest Castelan was attacked before Armstrong arrived at the scene. He also presents forensic evidence to corroborate his version of events and undermine the State's evidence, including DNA and fingerprint analysis suggesting he did not handle the knife or Medicaid card. Finally, he presents a blood spatter analysis expert report that suggests Castelan was lying near

No. 21-40130

the sidewalk and bleeding for several minutes before Armstrong arrived, contradicting the eyewitnesses' testimony.

Armstrong's petition was referred to the magistrate judge who issued a 127-page report and recommendation (R&R) recommending Armstrong's petition be denied. The magistrate judge determined that even if Armstrong's trial attorneys were deficient, he could not establish prejudice pursuant to *Strickland v. Washington*, 466 U.S. 668 (1984). And because he could not establish prejudice, he could not overcome the burden of showing the state court's decision presumably reaching the same conclusion was an unreasonable application of *Strickland*. The district court judge adopted the R&R in full and denied Armstrong's petition. The district court did, however, issue a certificate of appealability.

## STANDARD OF REVIEW

In an appeal from the denial of § 2254 relief, this court reviews issues of law de novo and findings of fact for clear error, applying the same standard to the state court's decision as the district court. *Ortiz v. Quarterman*, 504 F.3d 492, 496 (5th Cir. 2007). Armstrong's petition shall not be granted on any claim adjudicated in state court unless the adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court decision "unreasonably applies" the Supreme Court's clearly established precedent if it correctly identifies the legal rule but applies

it in an objectively unreasonable manner to the facts. *Williams v. Taylor*, 529 U.S. 362, 407–09 (2000). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (internal quotation marks and citation omitted). Relief should be granted "in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents." *Id.* at 102.

Ineffective assistance of counsel claims are governed by *Strickland v. Washington*, 466 U.S. 668 (1984). For trial counsel, Armstrong must show "(1) that his trial counsel rendered deficient performance, and (2) that the deficient performance resulted in actual prejudice." *King v. Davis*, 883 F.3d 577, 586 (5th Cir. 2018) (citations omitted). The first prong "sets a high bar" and a lawyer has "discharged his constitutional responsibility so long as his decisions fall within the 'wide range of professionally competent assistance.'" *Buck v. Davis*, 137 S. Ct. 759, 775 (2017) (citation omitted). For the second prong, Armstrong must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Adekeye v. Davis*, 938 F.3d 678, 682 (5th Cir. 2019) (footnote and citation omitted). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (footnote and citation omitted).

Armstrong alleges his trial attorneys conducted an inadequate pretrial investigation. In general, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. "[A] particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* "[A]n attorney must engage in a reasonable amount of pretrial investigation and 'at a minimum, . . . interview potential witnesses

and . . . make an independent investigation of the facts and circumstances in the case.'" *Bryant v. Scott*, 28 F.3d 1411, 1415 (5th Cir. 1994) (citation omitted).

Armstrong must overcome both the *Strickland* and § 2254(d) standards in tandem. *Richter*, 562 U.S. at 105 (describing the doubly deferential standard). So the ultimate question here is whether the state court's application of *Strickland* was unreasonable under § 2254(d). *Id.* It is not sufficient that this court determine Armstrong's trial attorneys' actions were unreasonable or prejudicial, i.e., that the state court decision is incorrect. Instead, Armstrong must show that there is no "reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*; *see also Trottie v. Stephens*, 720 F.3d 231, 241–42 (5th Cir. 2013) ("[T]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable." (internal quotation marks and citation omitted)).

## DISCUSSION

The state court's decision denying Armstrong's ineffective assistance of counsel claim was a reasonable application of *Strickland*. Our review of the state court's evidentiary hearing and the analysis provides sufficient support that Armstrong's trial attorneys made reasonable strategic decisions in their pretrial investigation and were thus not constitutionally deficient. And even if they were deficient, it was reasonable for the state court to conclude that Armstrong's proffered evidence would not have changed the outcome of the trial because the evidence still fails to cast sufficient doubt on the two eyewitness accounts of Armstrong attacking Castelan.

Armstrong's claim is based on three categories of evidence he alleges his trial attorneys should have obtained prior to trial. First, he raises his trial attorneys' failure to interview two potential witnesses because their testimony provides him with an "alibi" relative to the timeline of events.

Second, he raises the failure to obtain forensic evidence regarding the Medicaid card and the knife because it shows that Armstrong never handled the two items. Third, he raises his trial attorneys' failure to obtain expert blood spatter evidence that shows Castelan laid bleeding for several minutes by the sidewalk and was not stabbed in the alley as the eyewitnesses testified. We address each in turn.

## A. Alibi Witnesses

Armstrong presents the testimony of two witnesses: Faustino Barrera and Max Guerra. Together, Armstrong contends their testimony provides him with an alibi. Specifically, Barrera's testimony suggests Castelan was attacked 20 minutes before Corona and Reyes arrived at the scene, and Guerra's testimony places Armstrong blocks away from the scene only minutes before Corona and Reyes arrived.

Barrera was Castelan's next door neighbor. He states that he heard Castelan "cry out" "¿Por que, yo?!" at 9:00 p.m. He did not go outside or investigate what he heard. Then, 20 minutes later, he heard a woman scream followed shortly by police sirens. He was not interviewed by police or Armstrong's trial attorneys in 2006.

Guerra works at the local laundromat. In his post-arrest statement to police, Armstrong stated he walked south from the Sunshine Bar and "the guy that run the laundromat . . . saw" him. In a 2008 affidavit, Guerra states he closed the laundromat at 9:30 p.m. on the night of the murder. He states he walked north on 8th Street and saw Armstrong walking south on 8th Street about half a block north of the laundromat.[1] The two men said "hi" and kept

---

[1] The Sunshine Bar is located three blocks north of intersection of Silver Avenue and the alleyway where Castelan was attacked. The alleyway runs north-south between 7th

walking. Guerra did not notice anything particular about Armstrong that would suggest he was in a fight, in a rush, or angry. No more than three minutes later, Guerra says he heard police sirens and saw police cars heading north on 8th Street toward the Sunshine Bar.

Although the police did not interview Guerra as part of the investigation in 2006, a private investigator who was hired by Armstrong's trial attorneys did interview him. Guerra told the private investigator a similar story. In 2006, Guerra said he closed the store shortly after 9:00 p.m. He did not identify Armstrong as the man he saw. In fact, he suggested there was someone else who resembled Armstrong in the area and could have been the person he saw. Regardless, Armstrong's trial attorneys and private investigator knew about Guerra.

Based on these two witnesses, Armstrong argues Castelan was attacked at 9:00 p.m. when Barrera heard Castelan cry out. And because Guerra saw Armstrong at approximately 9:30 p.m., without any indication of being in a fight, Armstrong could not have been at the scene of the attack before 9:30 p.m. Armstrong, however, has not shown his trial attorneys' failure to obtain these witnesses' testimony was constitutionally deficient performance.

It was reasonable to not interview or seek out Barrera's testimony. Armstrong's post-arrest statement does not give rise to an alibi that would alert his trial attorneys to seek out supporting witnesses. Armstrong admitted he was at the scene when Corona and Reyes arrived. And he said he left the Sunshine Bar sometime between 8:30 and 9:00 p.m. To support his claim that Castelan was attacked before he arrived, Armstrong's trial attorneys may

---

Street in the west and 8th Street in the east. The laundromat is on 8th Street about halfway (one and a half blocks) between the Sunshine Bar and Silver Avenue.

have sought out witnesses who *saw* Armstrong before he arrived at the scene, who saw Armstrong when he found Castelan, or who saw Castelan being attacked by someone other than Armstrong. In his post-arrest statement, however, Armstrong did not identify any potential witnesses who could support his version of events. *See Strickland*, 466 U.S. at 691 (stating an attorney's informed decision are properly based on information supplied by the defendant).

Armstrong relies on several cases where this court has found deficient performance in a pretrial investigation for failure to interview witnesses. But his reliance is misplaced. In each of the cited cases, the court found deficiency and prejudice from a failure to interview *eyewitnesses* to the crimes who were "central to establishing the defense's theory-of-the-case." *See, e.g.*, *Harrison v. Quarterman*, 496 F.3d 419, 426–27 (5th Cir. 2007) (concluding counsel was deficient for failing to interview and call an eyewitness to crime where the case "turned on witness testimony"). Here, Armstrong's trial attorneys interviewed the eyewitnesses to the alleged crime. They also interviewed the one person Armstrong identified as seeing him right before the incident, Guerra from the laundromat. Although they did not interview Barrera, his testimony, on its own or in combination with Guerra's, does not impeach Corona and Reyes. Other than minor details and timing, Corona and Reyes consistently testified that Armstrong was attacking Castelan—not helping him.

In cases where we have held an attorney's investigation was deficient, it is typically because the attorney failed to interview eyewitnesses to the crime. *See Hughes v. Vannoy*, 7 F.4th 380, 389–92 (5th Cir. 2021); *Anderson*, 338 F.3d at 391–92 (finding deficient performance when attorney failed to interview eyewitnesses to the crime); *Soffar v. Dretke*, 368 F.3d 441, 473–74 (5th Cir. 2004) (concluding counsel was deficient for "their failure to take the most elementary step of attempting to interview the *single known*

*eyewitness* to the crime with which their client was charged" (emphasis added)). But that is not the case here. Although Barrera lived next door to Castelan, it was reasonable for Armstrong's trial attorneys to not seek out his testimony because, at the time, there was no basis to think he had information to support Armstrong's version of events.

The failure to obtain Barrera's testimony was not prejudicial either. Barrera's testimony offers nothing definitive to support Armstrong's version of events. Barrera heard Castelan cry out, but that does not necessarily mean that was when the attack occurred. Barrera did not look outside his window or follow up on what he heard in any way. Nor does Barrera contend that he heard anything else to support that moment as the attack. And even so, his testimony does not eliminate Armstrong as the one perpetrating the attack at that time.

Barrera's testimony is also inconsistent with evidence presented at trial. First, there was an HEB receipt found in Castelan's belongings with a timestamp of 9:24 p.m. This receipt is evidence that Castelan was alive and at the HEB around 9:24 p.m., not attacked at 9:00 p.m.[2] Second, Barrera's timing of hearing a woman scream and police sirens around 9:20 p.m. contradicts evidence of the police dispatch which was reported at 9:32 p.m. The police dispatch time is also corroborated by Corona and Reyes who consistently stated they left their apartment at around 9:30 p.m. Based on these discrepancies, Barrera's testimony does little to support Armstrong's case or discredit the State's. It was therefore reasonable for the state court to conclude the absence of Barrera's testimony did not prejudice Armstrong.

---

[2] Armstrong argues the time stamp was not verified at trial. But the receipt was introduced into evidence and the time stamp was emphasized in the State's closing argument. And Armstrong presents no reason or evidence to suggest that the time stamp would not have been verified if necessary.

No. 21-40130

Armstrong cannot establish his trial attorneys were deficient in failing to interview Guerra because they did interview him. Armstrong's private investigator interviewed Guerra who, at that time, said he closed the store shortly after 9:00 p.m. and did not definitively identify Armstrong as the man he saw walking. Guerra seeing Armstrong shortly after 9:00 p.m. does nothing to discredit the State's eyewitnesses or corroborate Armstrong's theory. It was therefore reasonable for Armstrong's trial attorneys to not investigate Guerra further.[3]

Based on this same reasoning, we conclude Armstrong was not prejudiced by the absence of Guerra's testimony. Guerra's statement does not establish an alibi relative to the timeline of the eyewitness accounts, the HEB receipt, and the police dispatch. Contrary to Armstrong's argument in this petition, Guerra is not "central to establishing" his defense. *Harrison v. Quarterman*, 496 F.3d 419, 427–28 (5th Cir. 2007) (finding prejudice when counsel fails to interview and call "a witness who is central to establishing the defense's theory-of-the-case"). We accordingly cannot say Armstrong was prejudiced by his trial attorneys' failure to develop Guerra's testimony further or call him as a witness at trial. It follows that the state court decision reaching the same conclusion was reasonable.

### B. Forensic Evidence

Armstrong presents forensic evidence of the knife and the Medicaid card which reveals neither his DNA nor his fingerprints were definitively on

---

[3] We recognize that in Guerra's latest affidavit signed in 2008 and attached to Armstrong's petition, Guerra states he closed the laundromat at 9:30 p.m. and identifies Armstrong as the man he saw shortly after. But this is not what he said to the private investigator in 2006. Neither the private investigator nor Armstrong's trial attorneys could anticipate Guerra's change in timing. So based on Guerra's statement in 2006, Armstrong's trial attorneys' decision to not pursue his testimony further was reasonable.

either item. This evidence, Armstrong contends, proves that he did not handle either item and disproves the circumstantial connection between him and the murder weapon as well as the State's robbery theory. But according to Armstrong's trial attorneys' testimony at the state court evidentiary hearing, they made strategic decisions to not pursue forensic evidence of the knife or Medicaid card.

Armstrong's trial attorneys' decision to not pursue forensic evidence of the knife was a reasonable decision to limit their investigation. Although Armstrong argues the forensic evidence would have eliminated him as a source of DNA and fingerprints on the knife, that fact was already revealed by the State's evidence. And Armstrong's trial attorneys relied on the absence of Armstrong's DNA or fingerprints on the knife at trial to argue the State's failure to connect Armstrong to the murder weapon. Each of Armstrong's trial attorneys stated the State's evidence supported their defense theory, i.e., that Armstrong never touched the knife. They testified that they did not need to seek further forensic evidence of the knife and that their decision was strategic. It was reasonable to not seek further testing when the testing provided by the State already failed to link Armstrong to the knife. This is the kind of "a reasonable decision that makes particular investigations unnecessary" contemplated by *Strickland*. 466 U.S. at 691. Importantly, that decision played into the strategy at trial, where the defense argued the State failed to link Armstrong to the knife with any forensic evidence.

This same reasoning applies to the Medicaid card. The Medicaid card had a visible bloody fingerprint on it and some other staining. There were also several latent nonbloody prints on the card. In the forensic report, Armstrong and Castelan were eliminated as the source for most of the nonbloody fingerprints. But Armstrong was not confirmed *or eliminated* as the source of the one *bloody* fingerprint—the only print that was definitively left after the

murder.[4] The forensic report also identifies a bloody stain with a pattern that "may be caused by a shoe." The pattern does not match the sole patterns of Castelan's or Armstrong's shoes.

Despite the visible bloody fingerprint and other staining, neither the State nor the defense conducted any forensic testing of it. Absent forensic evidence, Armstrong's trial attorneys argued the police planted the Medicaid card in Armstrong's belongings during the booking process. In fact, they relied on a video of the booking process that they contended showed as much. Moreover, the State did not provide any evidence that Armstrong had in fact handled the Medicaid card (other than it being "found" in his belongings). Armstrong's trial attorneys again thought the *lack* of evidence connecting Armstrong to the card was helpful to Armstrong's defense when considered with the booking video.

It was reasonable for his trial attorneys to conclude that they had enough evidence to cast doubt because they argued the booking video showed the card being planted. This is particularly true because they also thought it was risky to obtain forensic evidence that might reveal Armstrong *did* touch the card. *See Strickland*, 466 U.S. at 691 (stating counsel does not have to pursue investigations that might be harmful to defendant). This was a strategic decision that we will not second guess.

We also conclude it was reasonable for the state court to determine Armstrong was not prejudiced by the absence of this forensic evidence. First, the knife. Although Armstrong's trial attorneys did not have affirmative evidence excluding Armstrong from handling the knife, they emphasized the State's absence of evidence connecting him to the knife. And at trial, a State

---

[4] As the R&R points out, the Medicaid card was two months old and the nonbloody latent prints could have been created during that period before the murder.

expert testified it is possible for a person to handle an item and there still be no ability to obtain an identifiable fingerprint from that person.

The absence of Armstrong's DNA or fingerprints on the knife still does not cast doubt on the eyewitness testimony. Corona and Reyes testified that they saw Armstrong attacking Castelan. Neither stated they saw the weapon. Ultimately, the knife was not emphasized at trial other than Armstrong's trial attorneys continuously arguing the State failed to connect it to Armstrong. We cannot say that an expert making this same statement would have changed the outcome of the trial in light of the other evidence.

The failure to obtain forensic evidence of the Medicaid card was not prejudicial either, and in fact, leaves open the possibility that Armstrong's fingerprint *is* on the card. The forensic report does not eliminate Armstrong as the source of the single bloody fingerprint on the Medicaid card. This evidence could have created curiosity as to why he cannot be eliminated as the source of that print, and whether it was his. As for the shoe print, the report does not conclusively state that the pattern is from a shoe. It seems even less likely that it is from a shoe because Armstrong's own "tracker" has been unable to identify any shoe that matched the pattern on the card.

Ultimately, the State did not heavily rely on the Medicaid card and instead presented other circumstantial evidence that Armstrong robbed Castelan. The State did not mention the Medicaid card in its opening statement. During closing arguments, the State relied on the eyewitness testimony and discussed the evidence of robbery while excluding consideration of the Medicaid card. The witnesses from the Sunshine Bar testified that Armstrong left because he had no money and then returned with cash. Moreover, the crime scene itself showed Castelan's things thrown about and his empty wallet. This suggested that whoever committed the murder also robbed Castelan.

No. 21-40130

The eyewitness testimony and circumstantial evidence played a significant role in Armstrong's conviction. Because the knife and Medicaid card were not a focus of the trial, a forensic report on those items would not have changed the outcome.[5] The report still fails to cast doubt on the eyewitness testimony: Armstrong was attacking Castelan, not helping him. On the forensic evidence of the knife and Medicaid card, the state court's conclusion that Armstrong did not establish his trial attorneys' pretrial investigation was deficient or prejudicial was reasonable.

## C. Blood Spatter Evidence

Armstrong next points to expert blood spatter evidence that corroborates his contention that he found Castelan lying near the sidewalk and bleeding. According to a forensic scientist, Barton Epstein, there is a large pool of blood near the sidewalk. That large pool of blood is consistent with somebody lying there bleeding for several minutes. A forensic pathologist, Dr. Susan J. Roe opines that the stab wound to Castelan's jugular vein in his neck created that pool of blood near the sidewalk and the amount of blood in that pool required Castelan to be near the sidewalk for several minutes. Because Dr. Roe states Castelan was stabbed in the jugular vein near the sidewalk, she also opines that it is unlikely Castelan could have walked unassisted to the alley approximately 30 feet away, where the eyewitnesses

---

[5] Armstrong also proffers a report that he argues shows there was no blood *inside* his pants pockets and therefore shows that he couldn't have carried the bloody knife or Medicaid card in his own pockets as he ran away from crime scene. As the R&R noted, however, the report indicates that blood originated on the inside of both his front left and back left pockets.

That same report reveals that there is no blood on the inside of Castelan's pockets either—which Armstrong contends contradicts Corona's testimony that she saw the attacker rifle through Castelan's pockets before running off. It is unlikely this minor detail would have discredited Corona's testimony in a significant way.

saw the attack. Epstein also states the blood stains on Armstrong's grey t-shirt are consistent with "direct contact with the bloody body or clothing of Castelan," such as carrying or assisting Castelan. Epstein concluded the blood spatter evidence is not inconsistent with Armstrong's version of events. Epstein does not opine on whether the evidence is consistent with any other theory.

At the state court evidentiary hearing, Armstrong's trial attorneys testified that they thought about obtaining expert evidence on this issue but decided not to. According to them, the physical scene on its own was inconsistent with the eyewitness testimony. Specifically, the trial attorneys pointed out that there was little to no blood in the alley where Corona said she saw Armstrong cut or slash Castelan's throat. At the evidentiary hearing, the state court credited one of Armstrong's trial attorney's opinion that he believed the physical evidence of the blood, absent expert blood spatter evidence, was consistent with both the State's and Armstrong's version of events. This attorney also stated that he thought emphasizing the inconsistency of the blood spatter with Corona's testimony would not have helped because Corona and Reyes were both adamant about what they saw. In his view, he thought the better avenue of investigation and trial strategy was to discredit the eyewitness testimony.

Armstrong's trial attorneys' testimony sufficiently establishes a strategic decision in not obtaining blood spatter evidence. And based on the strength of the eyewitness testimony, the decision to focus on discrediting the eyewitnesses rather than pursue blood spatter evidence was reasonable. We see no reason to question this decision.

And while this blood spatter evidence is helpful to Armstrong, we cannot say it was unreasonable for the state court to conclude the failure to obtain blood spatter evidence was not prejudicial. The pool of blood being

consistent with Castelan being cut in the jugular vein and laying by the sidewalk for several minutes is objective evidence corroborating Armstrong's statement that he found Castelan laying on the ground near the sidewalk. It also tends to discredit Corona's claim that she saw Armstrong stab and slash Castelan by the van in the alley. Epstein's claim that the blood spatter evidence is consistent with Armstrong assisting and carrying Castelan is also helpful.

This evidence does not, however, address whether the blood spatter is consistent with the eyewitness accounts nor does it explain how blood was found near the fence and on the door of the minivan (contrary to Armstrong's version of events). Arguably, the evidence corroborates the eyewitness testimony, too.

Corona and Reyes testified they saw Armstrong and Castelan fighting and Castelan was trying to run away from Armstrong. Corona even said she saw them fighting closer to the sidewalk before they moved over to the fence. They also provided details that Castelan was thrown by the fence and that he touched the van to try and escape. In both places, blood was found. Blood being in either of those two places is inconsistent with Armstrong's statement that he picked up Castelan and attempted to walk him to the police station and that when he saw the van, he dropped Castelan and ran off.[6] Instead, it directly corroborates Corona's testimony that Castelan was trying to get away from Armstrong.

Both witnesses stated Armstrong and Castelan were already bloody before reaching the alley, which is corroborated by the evidence showing

---

[6] The fence is northeast from the sidewalk where the pool of blood was found. The intersection of the alley and Silver Avenue is southeast. As the R&R states, the blood on the fence suggests Armstrong took an unusual zig-zag route to help Castelan to the police station.

some of the stabbings occurred over by the sidewalk. Also, Castelan was stabbed up to 10 times and Corona and Reyes only stated that Armstrong bent over and stabbed or slashed Castelan, without indicating a number of stabs. So Armstrong's proffered blood spatter evidence does not concretely refute the State's theory or the eyewitness accounts. And some of it supports the State's theory.

Corona and Reyes were adamant that Armstrong was not helping Castelan—he was attacking him. The blood spatter evidence does not meaningfully discredit their testimony on that front. The state court was reasonable to conclude the blood spatter evidence would not have resulted in a different outcome for Armstrong.

## CONCLUSION

Armstrong has produced a considerable amount of evidence that tends to corroborate his post-arrest statement that he was only helping Castelan. Although this evidence could have been obtained by his trial attorneys during their pretrial investigation, we conclude that they made reasonable decisions to limit their investigation. The trial attorneys' failure to investigate this evidence was therefore not deficient performance pursuant to *Strickland*.

The absence of this evidence was not prejudicial because the State relied upon and emphasized the eyewitness testimony directly implicating Armstrong as Castelan's attacker. The new evidence reveals some inconsistencies with the eyewitness accounts, though not enough to meaningfully discredit them. The new evidence also fails to fully corroborate Armstrong's statement or explain other evidence of his guilt. So even if Armstrong's trial attorneys were deficient in their pretrial investigation, their performance did not prejudice him.

No. 21-40130

Accordingly, the state court's decision denying Armstrong's ineffective assistance of counsel claim for failure to conduct an adequate pretrial investigation was reasonable. We AFFIRM.